IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

---

| | |
|---|---|
| BERTINA RAE OLSETH,<br><br>            Plaintiff,<br><br><br>vs.<br><br>MATTHEW D. LARSON, an individual,<br><br>            Defendant. | ORDER and MEMORANDUM<br>DECISION<br><br><br><br>Case No. 2:02-CV-1122 CW |

---

In this action, Plaintiff Bertina Rae Olseth alleges that Defendant Matthew Larson violated her civil rights. Mr. Larson, a former Salt Lake City police officer, shot Ms. Olseth during an arrest. Mr. Larson contends that he acted reasonably because he believed that he and others were in danger, while Ms. Olseth contends that Mr. Larson used unreasonable and excessive force. Now before the court is Mr. Larson's motion for summary judgment based on qualified immunity. For the reasons below, his motion is GRANTED.

## BACKGROUND

On May 15, 1998, Salt Lake City police officers Mr. Larson and Officer Schuman, arrested Ms. Olseth on suspicion of buying cocaine. During the arrest, Mr. Larson placed Ms. Olseth in the front seat of a police vehicle whose motor was running. After being left alone, Ms. Olseth, who was handcuffed behind her back, moved to the driver's side. After she did so, the vehicle began to move backwards. When Mr. Larson saw the vehicle moving backwards he chased the vehicle on foot and threw his police baton at the windshield. Mr. Larson was joined

1

in the pursuit by Officer Schuman.  The vehicle then began to move forward.  Mr. Larson shot at the vehicle several times, hitting Ms. Olseth.

Many of the facts surrounding the incident are disputed.  In his affidavit, Mr. Larson contends that he was chasing after the backward-moving vehicle when the tires made a noise, the engine revved and the vehicle started to move forward.  He states that Ms. Olseth was facing him when the car started to move forward.  He asserts he was close to the front of the vehicle and even though he yelled "Stop!" and tried to backpedal out of the way, he did not think he could get out of the way.  At that moment he states that he felt his only option was to shoot Ms. Olseth.  He says that he quickly fired four shots through the windshield while retreating and moving to his right.  He further states that after he shot, the car slowed down and he ran after the vehicle, opened the door and stopped the car.

Officer Schuman, the other officer at the scene of the incident, states that Mr. Larson pursued the vehicle as it was driving backwards.  Officer Schuman also chased the vehicle.  He states that the car slowed, the tires spun, and the vehicle lurched forward.  Officer Schuman asserts that as the car was moving toward him and Mr. Larson, he believed he had a good chance of getting run over and he did not think he would have time to jump out of the way.  He states that he drew his weapon and felt he would have to shoot the driver to prevent her from hitting him.  Officer Schuman says that because Mr. Larson was in front of him, he did not have a clear shot and it was Mr. Larson who fired his weapon.  Officer Schuman was not hit by the car.

Officer Michele Rendon was another witness to the incident.  She watched the events from a truck on the corner of 300 West and 300 South.  She explains in her affidavit that as the officers appeared to be interviewing a man, the police car parked several feet behind a brown van began to move backwards.  She states that both officers chased the car and yelled "Stop!"

She states that the car then made a loud noise that sounded like gears dropping while a vehicle is still moving and the car started to move forward.  She states that at that moment she believed Mr. Larson was going to be run over.  It looked to her as though Mr. Larson was directly in the car's path.  She asserts that she then saw him quickly fire four shots.

Three non-police witnesses, Michael Larsen, Greg Caputo, and Anthony Michael Caputo also submitted affidavits.  Each of them were working at Tony Caputo's Market on the corner of 300 South and 300 West at the time of the incident.  Each stated that he saw the car begin to move backwards and the officers chase after it.  All three also said that when the car started to move forward, they thought the first officer closest to the car was going to get run over since he appeared to be directly in the car's path.  Mr. Larsen states, "I thought that the car was going to drive through the window of the market where we were standing, watching this happen."  (Aff. of Michael Larsen, ¶ 13, attached as Ex. D to Def.'s Memo. in Support.)

Ms. Olseth also submitted an affidavit telling her recollection of the incident.  According to her, she accidentally knocked the car's gear lever into reverse.  She asserts that after she did so, the car was rolling backward slowly and that the engine did not roar, that the tires did not "peel out" and that she did not touch the pedals.  She states that after Mr. Larson hit the car with the baton, she fell and hit the gear lever into drive.  As before, she states that the engine did not roar, nor did the tires "peel out."  She further asserts that she was facing backward during the entire incident and never touched the steering wheel, accelerator, or brakes.

Ms. Olseth also submits affidavits from two experts, David G. Lord and Charles Hinson.[1] David G. Lord, an expert witness in the field of accident reconstruction, claims the car could not have been traveling quickly in reverse.  He opines that for the car to change from reverse to

---

[1] Mr. Larson has moved to strike these affidavits.  Because the case would not come out differently even if these affidavits were excluded, however, the court will not analyze those motions.

forward direction in the short time period as Mr. Larson and Officer Schuman claim, the car tires would have had to squeal and leave skid marks on the pavement.  Mr. Lord asserts that there were no skid marks.  Mr. Lord opined that if the car was traveling 20 miles per hour and Mr. Larson was five feet from the car, he could not have avoided being hit by the car before he fired his weapon.  Mr. Lord further opined that if the car was traveling at 20 miles per hour at the time he fired, Mr. Larson would not have been able to run after the car, catch it, open the door, and put it in park in three car lengths.  On that basis, Mr. Lord concluded that the vehicle must have been traveling at low speed when it moved forward.

Mr. Hinson claims expertise in the field of ballistics.  Mr. Hinson used pictures of dowels stuck into the bullet holes in the windshield to determine the trajectory of the bullets.  He concluded that the angle and pattern of the bullet holes show that the car was moving at a low rate of speed and that Mr. Larson moved toward the car as he fired his weapon.  Additionally, Mr. Hinson opined that the angle of the last two bullet holes show that the bullets were fired from the right of the vehicle and very near the windshield.  In Mr. Hinson's opinion, Mr. Larson was not in the path of the moving car and he was close enough that he could see that Ms. Olseth was between the passenger's seat and the arm rest and not in control of the vehicle.

After the incident, Ms. Olseth was charged with several crimes related to these events.  Following a trial in Utah state court, she was convicted of attempting to escape.  She was acquitted of attempting to assault a police officer and of drug possession.  In May 2000, Ms. Olseth filed a suit against several defendants.  She filed a second suit in 2002, and later amended her complaint to name only Mr. Larson as a defendant.  In September 2008, after various procedural issues were resolved, Mr. Larson moved for summary judgment based on qualified immunity.  In her claim for relief under 28 U.S.C. § 1983, Ms. Olseth alleged that Mr. Larson

violated her rights under the Ninth, Tenth, and Fourteenth Amendments of the Constitution.  The Court granted Mr. Larson's motion for summary judgment with respect to Ms. Olseth's claims under the Ninth and Tenth Amendments but deferred a ruling on her Fourteenth Amendment claims.

**ANALYSIS**

Mr. Larson contends that he is entitled to qualified immunity in this case.  He asserts that even if Ms. Olseth could successfully allege a constitutional violation his actions did not clearly violate any rights.  Ms. Olseth responds that Mr. Larson should not receive a grant of qualified immunity.

## I.       THE QUALIFIED IMMUNITY STANDARD

To determine whether a defendant is entitled to qualified immunity, a court answers two questions: (1) whether a plaintiff has asserted that the defendant violated a constitutional or statutory right, and (2) "whether that right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right."  *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1218 (10th Cir. 2008) (quoting *Maestasv. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003)).  If the plaintiff "fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity."  *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (internal quotation marks omitted).

Once a defendant asserts a qualified immunity defense, "the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right."  *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007).  The first step to analyze a qualified immunity case requires the court to ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?"

*Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries," and the defendant is entitled to qualified immunity.  *Cortez*, 478 F.3d at 1114 (quoting *Saucier*, 533 U.S. at 201); *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007).[2]

## II.        VIOLATION OF A CONSTITUTIONAL RIGHT

Ms. Olseth claims that Mr. Larson violated her Fourth Amendment right to be free from excessive force when he shot her.  Specifically, the Fourth Amendment forbids "unreasonable seizures, including the use of force in making an arrest."  *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).  To decide whether the force used in a particular case is excessive, courts undertake "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Law enforcement officers may use some degree of force in doing their jobs and the ultimate question about when any force is allowed and whether it is excessive is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.

When a court considers objective reasonableness, it must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Casey*, 509 F.3d at

---

[2] In *Pearson v. Callahan*, 129 S. Ct. 808 (2009) the Supreme Court held that the two-part *Saucier* procedure should no longer be regarded as mandatory or inflexible.   The decision allowed judges to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 818.  Considering the facts in this case, it makes the most sense to proceed with the pre-*Pearson* order.

1281 (quoting *Graham*, 409 U.S. at 396).  In the context of a police chase, the Supreme Court

has held that, in "weighing the perhaps lesser probability of injuring or killing numerous

bystanders against the perhaps larger probability of injuring or killing a single person [the

driver]," it is appropriate to "take into account not only the number of lives at risk, but also their

relative culpability." *Scott v. Harris*, 550 U.S. 372.

     "The use of force must be judged from the perspective of a reasonable officer on the

scene rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97.  Any inquiry

into a use of force must therefore "embody allowance for the fact that police officers are often

forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly

evolving- about the amount of force that is necessary in a particular situation." *Id.*[3]

     In this case, the court is convinced that the Supreme Court's decision in *Brosseau v.

Haugen*, 543 U.S. 194 (2004) controls the excessive force inquiry.  In *Brosseau* the Supreme

Court held that an officer's use of deadly force against a felon fleeing from an officer by driving

away did not violate a plaintiff's rights under the Fourth Amendment.  *Id.* at 201.  Officer

Brosseau, the defendant, responded to a report of men fighting.  *Id.* at 195 and 200 fn. 4.  When

the defendant arrived, the suspect, for whom there was a felony no-bail warrant outstanding on

drug and other charges, ran away.  *Id.* at 195.  The suspect got in a Jeep and locked the doors.

*Id.* at 195-96.  He ignored defendant, who pointed her gun at him and ordered him out of the

---

[3]  The Tenth Circuit recently underlined the considerable leeway given to an officer when
he or she is "in a high-pressure situation where time is of the essence." *Ellis v. Ogden
City*, No. 08-4166, slip op. at 5 (10th Cir. Dec. 17, 2009).  In *Ellis*, the circuit court
followed Supreme Court precedent to conclude that in the context of a high speed police
chase, an officer will only face liability for a substantive due process violation if there is
"evidence of a purpose to cause harm unrelated to the legitimate object of the arrest to
satisfy the element of arbitrary conduct shocking to the conscience." *Id.*  Because *Ellis*
was obviously decided after the parties briefed this motion, neither party has argued that
it controls here.  The court does believe, however, that the standard announced in *Ellis*
would not change its analysis of Mr. Larson's actions in this case.

vehicle. *Id.* at 196.  Defendant hit the driver's side window with her handgun until it broke.  *Id.*
She tried to grab the keys and struck the suspect with her handgun.  *Id.*  "As the Jeep started or
shortly after it began to move, [defendant] jumped back and to the left.  She fired one shot
through the rear driver's side window at a forward angle, hitting [the suspect] in the back."  *Id.* at
197.  Defendant later explained that she shot the suspect because she feared for the safety of "the
other officers on foot who [she] believed were in the immediate area, [and] for the occupied
vehicles in [the suspect's] path and for any other citizens who might be in the area."  *Id.*

   The suspect sued the defendant in a § 1983 action for excessive force.  The district
court granted summary judgment for the defendant based on qualified immunity and the Ninth
Circuit reversed.  The Supreme Court then reversed the Ninth Circuit and ruled that the
defendant was entitled to qualified immunity.  In support, the *Brosseau* Court recognized its own
precedent that "'[w]here the officer has probable cause to believe that the suspect poses a threat
of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable
to prevent escape by using deadly force.'"  *Id.* at 197-98 (quoting *Tennessee v. Garner*, 471 US.
1, 11 (1985)).  The Court concluded that "this area is one in which the result depends very much
on the facts of each case…. Brosseau's actions fell in the 'hazy border between excessive and
acceptable force.'"  543 U.S. at 201 (quoting *Saucier*, 533 U.S. at 206).  The Court concluded
that judicial precedent "by no means 'clearly establish[ed]' that Brosseau's conduct violated the
Fourth Amendment."  543 U.S. at 201.

   As the court understands *Brosseau*, if two criteria are met an officer's use of deadly
force is not constitutionally unreasonable: (1) an officer must have probable cause to believe a
suspected felon is using a motor vehicle to flee from police, and (2) an officer must have

probable cause to believe the fleeing suspect poses a threat of serious harm to the officer or others.  *See* 543 U.S. at 199-201.

   The facts that meet this test are simply not in dispute here.  First, Ms. Olseth was arrested on suspicion of purchasing cocaine, a felony.  She was in a police car, in official custody, handcuffed with her hands behind her back.  As established by the jury's verdict in her criminal case, she intentionally tried to escape from official custody.  It is undisputed that while she attempted to flee, the police vehicle in which she sat moved backwards on a busy street, next to a heavily used public park and adjacent to several businesses and parked cars.  The officers chased after the police vehicle on foot, repeatedly shouting commands at Ms. Olseth to stop the vehicle, but the vehicle did not stop.  The car then began to move forward.  Even if it is true that Ms. Olseth was not purposely taking these actions, a reasonable police officer could easily construe them as Ms. Olseth attempting to flee using the car.  These facts support a conclusion that Mr. Larson had probable cause to believe she posed a threat of harm to him and others.

   The facts asserted by Ms. Olseth and her two expert witnesses are not material and do not change the outcome.  In her affidavit, Ms. Olseth asserts that she accidentally hit the gear lever twice, that she was never in control of the vehicle, that the vehicle's engine did not roar nor did the tires squeal, and that she was facing backwards the entire time.  But these assertions, even if true, do not alter the material facts.  That is, Ms. Olseth was a suspected felon trying to escape, or Mr. Larson could have reasonably so believed.  She was in a car and the car began to move in a busy area indicating a possible danger to the officers and the public.  These circumstances gave Mr. Larson probable cause to fear for his and the public's safety.

   Nor do the experts' opinions affect the outcome here, even if they are valid.  First, Mr. Lord contends that the car was traveling at a low speed.  Even if this is true, a moving car can

still harm the public even if it is not going fast. Second, Mr. Hinson's surmise that Mr. Larson approached Ms. Olseth and shot from the side of the car is also not material. Because Mr. Larson had probable cause to believe that he and the public were in danger, he was allowed to use deadly force. The court is not permitted to second guess and insist that Mr. Larson should have attempted to use non-deadly methods, such as trying to grab the keys, which could have further jeopardized his safety.

As stated previously, "[t]he use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97. Ms. Olseth was trying to escape while in a police vehicle on a busy street near a park and businesses with a large amount of motor and pedestrian traffic. It is not reasonable to ask an officer in that situation to correctly decide whether Ms. Olseth was purposely using the car to flee, or was, out of sheer coincidence, only appearing to use the car to flee. Additionally, the fact that she was handcuffed behind her back and her assertion that she was kneeling down and facing backwards, unable to control the brake, accelerator, and steering wheel suggests that she was unable to control the vehicle, likely posing a grave threat to people in the immediate area of the car. Considering the circumstances and the fact that Mr. Larson had to make a split second decision in a stressful situation, it was reasonable for him to believe Ms. Olseth posed a serious threat of harm to persons in the vicinity.

Consistent with *Brosseau*, Mr. Larson's conduct did not violate the Fourth Amendment. As stated previously, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries." *Cortez*, 478 F.3d at 1114 (quoting *Saucier*, 553 U.S at 201); *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007). If the plaintiff "fails to satisfy either part of this two-part inquiry, the court must grant the defendants

qualified immunity." *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (internal quotation marks omitted). Ms. Olseth failed to establish that Mr. Larson violated her constitutional rights. Accordingly, no further review is necessary and Mr. Larson is granted qualified immunity.

## III.        CLEARLY ESTABLISHED RIGHT

Even if Ms. Olseth had proven that Mr. Larson violated her constitutional right, however, she would be unable to show the second prong of the qualified immunity test. Under that prong, a plaintiff must show "a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Hannula v. City of Lakewood*, 907 F.2d 131 (10th Cir. 1990). Put another way, a plaintiff has to demonstrate that the law was clearly established at the time of the alleged violation so that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Even if the court has read *Brosseau* too broadly about establishing a test for when deadly force is allowed against felons fleeing in motor vehicles, *Brosseau* still supports a finding of qualified immunity for Mr. Larson on the second prong. In fact, the analysis in *Brosseau* focused on the second prong, discussing whether it would have been clear to the defendant police officer that shooting the suspect in those circumstances was excessive force. The Court concluded that it would not have been clear. *Brosseau*, 543 U.S. at 200-01.

Here, Ms. Olseth fails to demonstrate that the law was clearly established at the time of the alleged violation so that "a reasonable officer would understand that what he is doing violates that right." *Anderson v*, 483 U.S. at 640. That is, Ms. Olseth points to no authority clearly establishing that shooting a handcuffed felony suspect who appears to be fleeing in a car and who appears to pose a threat to officer and public safety is a constitutional violation. The

11

court has reviewed the authorities on which Ms. Olseth relies to argue otherwise and is not convinced that they would apply here.

## **ORDER**

For the reasons set forth above:

Mr. Larson's motion for summary judgment (Dkt. No. 78) is GRANTED.

All other outstanding motions are DENIED as moot.

SO ORDERED this 21st day of December, 2009.

BY THE COURT:

_____
Clark Waddoups
United States District Judge